UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JASON RILEY,

                             Plaintiff,

              v.

BRIAN FISCHER, Commissioner,
THOMAS GRIFFIN, Superintendent,
JAMES ESGROW, Commissioner's Hearing Officer,
ALBERT PRACK, Director of Special Housing,
FLOYD FULLER, Registered Nurse,
JEREMY CLEMENT, Registered Nurse,
JOHN vonHAGN, Nurse Administrator, and
VINCENT CAPECE, Correctional Guard,

                            Defendants.

_____

|  |  |
|---|---|
|  | REPORT |
|  | and |
|  | RECOMMENDATION |
|  |  |
|  | 13-CV-331V(F) |

APPEARANCES:         BARCLAY DAMON, LLP
                              Attorneys for Plaintiff
                              MEGAN E. BAHAS, of Counsel
                              200 Delaware Avenue
                              Suite 1200
                              Buffalo, New York  14202

                              LETITIA A. JAMES
                              Attorney General, State of New York
                              Attorney for Defendants
                              KATHLEEN M. KACZOR
                              Assistant Attorney General, of Counsel
                              Main Place Tower
                              350 Main Street
                              Suite 300A
                              Buffalo, New York  14202

## **JURISDICTION**

This case was referred to the undersigned by Honorable Lawrence J. Vilardo on

January 18, 2018, for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Defendants' motion for summary judgment (Dkt. 28), filed January 16, 2018.

## BACKGROUND

On April 1, 2013, Plaintiff Jason Riley ("Plaintiff"), an inmate in the custody of

New York Department of Corrections and Community Supervision ("DOCCS"), then

proceeding *pro se*, commenced this civil rights action pursuant to 42 U.S.C. § 1983,

alleging Defendants, all employees of DOCCS, violated his rights under the First, Eighth

and Fourteenth Amendments when they were deliberately indifferent to his serious

medical needs, denied Plaintiff due process, and retaliated against Plaintiff for filing

inmate grievances.  Defendants' answer was filed March 30, 2016 (Dkt. 13).  On

October 12, 2016, the undersigned assigned Megan E. Bahas, Esq. ("Bahas"),[1] to

represent Plaintiff in this matter (Dkt. 19).

On January 16, 2018, Defendants filed the instant motion for summary judgment

(Dkt. 28) ("Defendants' Motion"), attaching Defendants' Memorandum of Law in Support

of Motion for Summary Judgment (Dkt. 28-1) ("Defendants' Memorandum"),

Defendants' Statement of Undisputed Facts (Dkt. 28-2) ("Defendants' Statement of

Facts"), the Declaration of Vincent Capece (Dkt. 28-3) ("Capece Declaration"), the

Declaration of Jeremy Clement (Dkt. 28-4) ("Clement Declaration"), the Declaration of

James Esgrow (Dkt. 28-5) ("Esgrow Declaration"), the Declaration of Floyd Fuller (Dkt.

28-6) ("Fuller Declaration"), the Declaration of Thomas Griffin (Dlt, 28-7) ("Griffin

Declaration"), the Declaration of Assistant Attorney General Kathleen M. Kaczor (Dkt.

---

[1] At the time of her appointment as counsel, Bahas was known as "Moran."

28-8) ("Kaczor Declaration"), the Declaration of Hanna Martin (Dkt. 28-9) ("Martin

Declaration"), the Declaration of Physician Assistant Benjamin Oakes (Dkt. 28-10) ("PA

Oakes Declaration"), the Declaration of Albert Prack (Dkt. 28-11) ("Prack Declaration"),

and the Declaration of John vonHagn (Dkt. 28-12) ("vonHagn Declaration").  On March

21, 2018, Plaintiff filed the Memorandum of Law in Opposition to Defendants' Motion for

Summary Judgment (Dkt. 35) ("Plaintiff's Response"), attaching the Affidavit of Plaintiff

Jason Riley (Dkt. 35-1) ("Plaintiff's Affidavit"), a volume of exhibits to Plaintiff's Affidavit

(Dkt. 35-2) ("Plaintiff's Exh(s). __"),[2] the Attorney Declaration of Megan E. Bahas, Esq.

(Dkt. 35-3) ("Bahas Declaration"), exhibit 1 to Bahas Declaration (Dkt. 35-4) ("Bahas

Declaration Exh. 1"), and the Counter Statement of Facts (Dkt. 35-5) ("Plaintiff's

Statement of Facts").  On April 11, 2018, Defendants filed Defendants' Reply

Memorandum of Law in Further Support of Their Motion for Summary Judgment (Dkt.

37) ("Defendants' Reply"), attaching the Reply Declaration of Assistant Attorney General

Kathleen M. Kaczor (Dkt. 37-1) ("Kaczor Reply Declaration"), the Declaration of

Benjamin Oakes (Dkt. 37-2) ("PA Oakes Reply Declaration"), and the Declaration of

John vonHagn (Dkt. 37-3) ("vonHagn Reply Declaration").  Oral argument was deemed

unnecessary.

Based on the following, Defendants' Motion should be GRANTED.


## **FACTS**[3]


---

[2] Plaintiff's Exhibits were initially filed in redacted form (Dkt. 35-2), but on March 23, 2018, were filed in
unredacted form under seal (Dkt. 36).
[3] Taken from the pleadings and motion papers filed in this action.

Prior to his incarceration, Plaintiff Jason Riley ("Plaintiff" or "Riley"), an inmate in the custody of New York Department of Corrections and Community Supervision ("DOCCS"), was involved in a motorcycle accident resulting in injuries requiring surgical removal of two discs in his spine.  Plaintiff maintains that on July 13, 2012, upon being transferred to Southport Correctional Facility ("Southport"), from Elmira Correctional Facility ("Elmira"), medical treatments Plaintiff received at Elmira for continuing medical complications relating to his back surgery were discontinued, including use of a TENS Unit[4] and back brace, and medications, and that Plaintiff was not examined by a medical doctor until September 18, 2012, despite Plaintiff's repeated requests to be examined by a physician for his complaints of pain and numbness, and that the alleged deprivation of medical care for his back caused his condition to worsen.  Plaintiff further maintains that despite repeated complaints of difficulty urinating, colon issues, blood in his urine and pain so extreme as to interfere with his daily activities, as well as laboratory tests indicating the presence of blood in his urine, Defendants falsely reported on August 15, and November 12, 2012, that his laboratory test results were normal.  According to Plaintiff, Defendants continued to refuse to schedule Plaintiff to be examined by a medical doctor in connection with his complaints.  Plaintiff names as Defendants in connection with his Eighth Amendment denial of medical care claims Southport Nurse Administrator John vonHagn ("vonHagn"), and registered nurses Floyd Fuller ("Fuller"), and Jeremy Clement ("Clement").

Plaintiff maintains that in retaliation for his continued complaints about his medical condition, on December 5, 2012, he was approached by Defendant

---

[4] "TENS" is the acronym for transcutaneous electrical nerve stimulation and a "TENS unit" is a device that sends electrical pulses to stimulate nerves for therapeutic purposes.

Correctional Guard Vincent Capece ("Capece"), who advised Plaintiff had been

randomly selected for a urinalysis test.  Plaintiff alleges that prior to being administered

the urinalysis he was not asked, as required by DOCCS's urinalysis protocol, about

medications, medical complications, or whether he was hindered in providing a urine

sample by a "shy bladder."  When Plaintiff protested the manner in which the urinalysis

test was being administered and failed to provide a urine sample, Plaintiff was issued an

Inmate Misbehavior Report ("IMR"), charging Plaintiff with violating DOCCS Rules

106.10 (disobeying a direct order), and 180.14 (failing to comply with instructions for

urinalysis testing), and was subjected to a Tier III disciplinary proceedings including a

hearing held on December 19, 2012, before Defendant Commissioner's Hearing Officer

James Esgrow ("Esgrow"), who, following the hearing, found Plaintiff guilty of the

charged violations and imposed a sentence of six months in Special Housing Unit

("SHU"), and concomitant loss of privileges and visitation rights.  Plaintiff's disciplinary

sentence was upheld on appeal by Defendant Southport Superintendent Thomas Griffin

("Griffin"), and upon further appeal to Defendant DOCCS Director of Special Housing

Unit/Inmate Discipline Albert Prack ("Prack").  According to Plaintiff, Defendants

Esgrow, Griffin, and Prack predetermined Plaintiff's guilt on the IMR which is

demonstrated by Defendants' (1) denying Plaintiff's request to call witnesses, (2) failure

to provide a written refusal for denying Plaintiff's requested witnesses, (3) failure to

compel witnesses from Southport's medical department to retrieve Plaintiff's relevant

medical records, (4) failure to consider the role of Plaintiff's medical condition in

Plaintiff's failure to provide a urine sample, and (5) abusing sentencing discretion in

suspending Plaintiff's visitation rights, program privileges, and telephone privileges for six months.

## DISCUSSION

**1.    Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).  A defendant is entitled to summary

judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit

a reasonable juror to return a verdict in his or her favor on'" an essential element of a

claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec.

Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379

(2d Cir. 1992)).  Once a party moving for summary judgment has made a properly

supported showing of the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that

would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes

Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  Any "disputed questions of

material fact [however] should be resolved by a jury at trial, not by a court at summary

judgment." *Dufort v. City of New York*, 874 F.3d 338, 349-50 (2d Cir. 2017) (quoting

*Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of a

judge ... [when] he is ruling on a motion for summary judgment....") (bracketed material

in original) ).  "[F]actual issues created solely by an affidavit crafted to oppose a

summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City

Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

      In the instant case, Plaintiff asserts as claims denial of adequate medical

treatment, retaliation, and due process, all in violation of Plaintiff's civil rights under 42

U.S.C. § 1983 ("§ 1983"), pursuant to which civil liability is imposed upon persons who,

acting under color of state law, deprive an individual of rights, privileges, or immunities

secured by the Constitution or the laws of the United States.  42 U.S.C. § 1983.  Section

1983 is not, however, a source of substantive rights but, rather, is a vehicle for

vindication of federal rights elsewhere conferred by the Constitution and federal statutes. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Here, Plaintiff's claims invoke the Eighth Amendment's protection against cruel and unusual punishment (denial of adequate medical care), First Amendment (retaliation), and Fourteenth Amendment (due process).

Defendants argue in support of summary judgment that Plaintiff failed to administratively grieve several of his claims, Defendants' Memorandum at 3-6, Plaintiff's medical indifference claims are baseless, *id.* at 6-20, Plaintiff's retaliation claim fails on the merits, *id.* at 20-21, Plaintiff's due process claim also fails on the merits, *id.* at 21-28, and Defendants Griffin and Prack are entitled to qualified immunity or, alternatively, were not personally involved in the claims asserted against them. *Id.* at 28-29. In opposing summary judgment, Plaintiff argues material issues of fact preclude summary judgment on Plaintiff's Eighth Amendment claim for inadequate medical care, Plaintiff's Response at 3-13; as well as on Plaintiff's retaliation claim, *id.* at 13-15, and due process claim. *Id.* at 15-21. In further support of summary judgment, Defendants argue Plaintiff failed to adequately challenge numerous of Defendants' asserted undisputed issues of fact requiring such facts be deemed admitted, Defendants' Reply at 1-2, and reiterate that Plaintiff's medical indifference claims are baseless, *id.* at 2-7, Plaintiff's retaliation claim is groundless, *id.* at 8, the due process arguments are frivolous, *id.* at 8-10, and Plaintiff's claims against Defendants Griffin and Prack fail for lack of personal involvement. *Id.* at 10.

### A.    Deeming Facts Admitted

Defendants argue that Plaintiff's responses to numerous facts set forth in Defendants' Statement of Facts are either bald denials without any supporting evidence or averments that Plaintiff can neither admit nor deny the statements, and that such responses are deficient requiring, under Local Rule of Civil Procedure – WDNY 56(a)(2) ("Local Rule 56(a)(2)"), the court to deem such facts admitted.  Defendants' Reply at 1-2.  Although the court does not condone non-compliance with Local Rule 56(a)(2)'s requirement that "[e]ach numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement," the Second Circuit has instructed that "[a] local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply."  Fed.R.Civ.P. 83(a)(2); *Buck v. Cleary*, 345 Fed.Appx. 660, 662 (2d Cir. Sept. 14, 2009) (finding district court abused discretion in deeming admitted defendants' statement of material facts based on plaintiff's failure to separately respond to each stated fact as required under applicable local rule, vacating lower court's decision to do so in the absence of any evidence that the noncompliance was willful, and remanding the pertinent portion of the decision for reconsideration).  In the absence of any evidence Plaintiff's failure to strictly comply with Local Rule 56(a)(2) was willful, the court will not deem any facts admitted as Defendants requested.

### B.    Exhaustion of Administrative Remedies

Defendants argue with regard to the Eighth Amendment claim that Plaintiff exhausted administrative remedies, as required by the Prison Litigation Reform Act

("PLRA"), 42 U.S.C. § 1997e ("§ 1997e"), only insofar as Plaintiff alleges he was denied adequate medical care for his back.  Defendants' Memorandum at 3-6.  In opposition, Plaintiff argues the grievance filed regarding his Eighth Amendment denial of adequate medical care claim was sufficiently broad to encompass all of Plaintiff's claims for inadequate medical care including urological problems, Plaintiff's Response at 11-12, and that Plaintiff separately exhausted administrative remedies relative to his retaliation claim.  *Id.* at 15.  Defendants have not argued in further support of summary judgment based on Plaintiff having failed to exhaust administrative remedies except with regard to Plaintiff's medical indifference claim for which Defendants maintain the medical indifference claim was not exhausted as to Plaintiff's alleged urinary problems which Plaintiff maintains did not arise until August 2012, after Plaintiff filed an inmate grievance.  Defendants' Reply at 2-3.

As relevant here, the § 1997e of the PLRA provides "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983][5]. . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Summary judgment may be granted based on an inmate's failure to exhaust administrative remedies.  *Williams v. LaClair*, 128 Fed.Appx. 792, 793 (2d Cir. 2005) (affirming district court's grant of summary judgment where record devoid of evidence the plaintiff satisfied the PLRA's exhaustion requirements).  The language of the PLRA's exhaustion requirement has been deemed "mandatory" which "means a court may not excuse a failure to exhaust, event to take such circumstances [giving rise to a failure to exhaust] into account."  *Ross v. Blake*, __

---

[5] Unless otherwise indicated, bracketed material has been added.

U.S. __; 136 S.Ct. 1850, 1856-59 (2016) (holding that prior to commencing an action challenging prison conditions, an inmate must exhaust administrative remedies without regard to the circumstances under which administrative remedies are asserted as justifiably not exhausted, provided such remedies are available).

In New York, the formal exhaustion of administrative remedies requires compliance with the procedures established by the Inmate Grievance Program ("IGP"), N.Y. Comp. Codes R & Regs. tit. 7 § 701.1 *et seq.* ("7 NYCRR § __").  Under the IGP there are three levels of review, each subject to deadlines, commencing with the inmate's filing of an inmate grievance ("IG") with the Inmate Grievance Review Committee ("IGRC") within 21 days of the alleged incident.  7 NYCRR § 701.5(a).  The IGRC has 16 days to review and resolve the IG by written decision, 7 NYCRR § 701.5(b), and if the inmate is unsatisfied with the IGRC's response, the inmate has seven days in which to appeal the response to the relevant correctional facility's superintendent, 7 NYCRR § 701.5(c), who must respond within 20 days, following which the inmate has seven days to seek further review by the Central Office Review Committee ("CORC").  7 NYCRR § 701.5(d).  The CORC's decision, which must be issued within 20 days, becomes the final administrative decision.  7 NYCRR § 701.5(d)(1) and (2)(ii).

"The PLRA's exhaustion requirement is designed to 'afford[ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (quoting *Porter v. Nussle*, 634 U.S. 516, 525 (2012)).  "Consistent with this purpose, a prisoner must allege facts sufficient to alert corrections officials 'to the nature of the claim,' and

'provide enough information about the conduct' at issue 'to allow prison officials to take appropriate responsive measures.'" *Singh v. Lynch*, 460 Fed.Appx. 45, 47 (2d Cir. Feb. 8, 2012) (quoting *Johnson*, 380 F.3d at 697).  As such, "'[a]s in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief.  All the grievance need do is object intelligibly to some asserted shortcoming.'" *Turner v. Goord*, 376 F.Supp.2d 321, 324 (W.D.N.Y. 2005) (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002), and citing *Johnson*, 380 F.3d at 697 (citing *Strong* with approval)).  Because failure to exhaust administrative remedies is an affirmative defense, when asserted as a ground for summary judgment, the defendant "bear[s] the initial burden of establishing, by pointing to 'legally sufficient source[s]' such as statutes, regulations, or grievance procedures, that a grievance procedure exists and applies to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)).

In the instant case, the record establishes that Plaintiff, on July 30, 2012, filed an inmate grievance assigned Grievance SPT-54355-12 ("the Grievance"),[6] describing his problem as

> I had an operation on my back and am not getting my medication or proper medical attention.  I am losing feeling in my legs and toes and it is hard for me to move.  The pain in my back and spine is becoming "unbearable" and I cannot sleep.  I have been requesting to see a doctor since "July-13-12" and I have not seen no [*sic*] one.  I put in sick call slips "everyday" and still no medical attention. I have copies of every sick call slip I put in and I am not being heard.

Grievance.

The corrective action Plaintiff sought from DOCCS in filing the Grievance included seeing a doctor, "proper medical attention," "proper medication," and a TENS Unit for

---

[6] Filed as Martin Declaration Exh. A (Dkt. 28-9 at 8-9).

his back.  *Id.*  Plaintiff maintains that the "Grievance is not so narrow" as to limit

Plaintiff's administratively exhausted denial of medical treatment claims to only his back

pain, but the "Grievance was sufficiently broad to encompass all of his claims for

inadequate medical care," pertaining to his back condition, including nerve damage,

disc herniation, arthritis, sciatica,[7] chronic pain, and associate urological problems.

Plaintiff's Response at 12.  As such, Plaintiff maintains his Grievance adequately

describes his subjective complaints and encompasses all related medical conditions

stemming from his motorcycle accident and therefore satisfies § 1997e.  *Id.*

As Defendants argue, Defendants' Reply at 2-3, the Grievance, including the

original grievance filed July 30, 2012, as well as his appeals to the Superintendent and

the CORC and the respective responses, are devoid of any mention of urological

problems.  *See* Martin Declaration Exhs. A through F (Dkt. 28-9 at 8-19).  In particular, a

claim will be considered administratively exhausted where an inmate grievance provides

prison officials with the necessary information to investigate the complaints, and

Defendants' responses to an inmate grievance and its appeals can establish the claims

investigated in connection with the grievance are exhausted.  *Espinal v. Goord*, 558

F.3d 119, 128 (2d Cir. 2009) (holding inmate grievance alleging excessive force and

retaliation sufficient to exhaust claim for denial of medical care where although the

grievance did not "explicitly discuss the misconduct by medical personnel which was

alleged in the complaint," that denial of medical care was discussed in the grievance's

denial established DOCCS considered such allegations when reviewing the grievance).

In the instant case, however, not only does the Grievance fail to mention Plaintiff's

---

[7] According to Plaintiff, sciatica "causes pain, tingling, numbness or weakness that travels down the low back and into the leg or extremity."  Plaintiff's Response at 12.

urological condition, but Defendants' responses to the Grievance and subsequent appeals fail to establish Defendants understood that Plaintiff, in filing the Grievance and appeals, intended to complaint not only of his back condition, but a related urological condition. *See* IGRC Response (Martin Declaration Exh. C (Dkt. 28-9 at 12-13) (considering Grievance as asserting only complaints about back pain attributed to "mild arthritis of his lower back," for which Plaintiff had been prescribed pain medication, which Plaintiff did not seek to have refilled, and noting Plaintiff had been seen by "Pain Management" and had an upcoming appointment regarding his low back pain, and that no medical documentation establishing Plaintiff had been prescribed a TENS Unit had been found)); Superintendent's Decision (Martin Declaration Exh. E (Dkt. 28-9 at 16-17) (affirming the IGRC Response without further comment)); and CORC Decision (Martin Declaration Exh. F (Dkt. 28-9 at 18-19) (upholding the Superintendent's Decision because Plaintiff was seen in the pain clinic on August 21, 2012, and by his primary care provider on October 29 and November 23, 2012, was prescribed Voltaren and a TENS Unit was not medically necessary)). That Defendants' investigation of Plaintiff's Grievance did not extend beyond Plaintiff's back pain complaints is further underscored by the observation made in the CORC's Response that "the grievant has raised a separate issue in his appeal statement that was not addressed in his original complaint. This issue could be the subject of a separate grievance. CORC has not been presented with sufficient evidence to substantiate improper medical care." Dkt. 28-9 at 19. The "separate issue" to which the CORC Response refers is the loss of feelings in Plaintiff's legs and toes which, according to Southport medical personnel, indicated Plaintiff's

back condition was "more than arthritis." *Id.* at 17; *see also* Discussion, *supra*, at 12-13 (discussing Plaintiff's asserted sciatica).

Insofar as Plaintiff alleges he complained daily of difficulty urinating and colon issues, Complaint ¶ 16, Plaintiff admitted in his deposition and affidavit filed in opposition that he never complained of such issues to any Southport medical personnel until December 6, 2012, Plaintiff's Affidavit ¶¶ 38-41; Plaintiff's Dep. Tr.[8] at 71, well after Plaintiff filed the exhausted Grievance on July 30, 2012. Nor did Plaintiff raise any concerns of urological problems in any of the letters Plaintiff wrote to various agencies and DOCCS officials complaining about his back and spine pain. *See* Kaczor Declaration Exh. B (Dkt. 28-8 at 38-48). Accordingly, Plaintiff's newly raised complaint does not encompass his alleged urological problems, such that Plaintiff's denial of medical treatment claim is exhausted as to his back condition, but not as to his urological condition.

Furthermore, although Plaintiff also maintains he exhausted administrative remedies as to his retaliation claim, Plaintiff's Response at 15, but does not address any efforts to exhaust his due process claim asserted with regard to the Tier III disciplinary hearing, Defendants have not argued Plaintiff failed to exhaust available administrative remedies with regard to such claims and, thus, have failed to meet their burden on their affirmative defense relative to such claims. *Hubbs*, 788 F.3d at 59. Accordingly, the court does not address whether Plaintiff exhausted available administrative remedies relative to his retaliation and due process claims.

---

[8] References to "Plaintiff's Dep. Tr." are to pages of the transcript of Plaintiff's August 23, 2017 deposition, portions of which are filed as Kaczor Declaration Exh. A (Dkt. 28-8 at 3-37).

Summary judgment based on Plaintiff's failure to exhaust administrative remedies should be GRANTED insofar as Plaintiff claims he was denied adequate medical care for his urological condition, but not as to his back condition, his retaliation claim or his denial of due process claim.

### C.    Denial of Adequate Medical Care

Plaintiff's claim that he was denied adequate medical care for his low back pain at Southport is asserted against Defendants vonHagn, Southport's Nurse Administrator, and Fuller and Clements, both registered nurses.  According to Plaintiff, between July 18 and September 18, 2012, he received no medical treatment with vonHagn and Clement preventing Plaintiff from receiving medical care or seeing a physician, *id.*, and vonHagn, Clement and Fuller removing Plaintiff's from ongoing therapy, medications, and "healing devices" causing his condition to worsen.  *Id.* ¶¶ 13-14.  Plaintiff further maintains that on August 15, 2012, Clement reported Plaintiff's laboratory results of urine samples were normal when they were not, *id.* ¶ 16-17, and despite vonHagn's assurances to the contrary, Plaintiff was never put on the list to see a medical doctor. *Id.* ¶ 18.

Plaintiff's claim of "deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because the right the plaintiff seeks to vindicate arises from the Eighth Amendment's prohibition of 'cruel and unusual punishment.'"  *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) (quoting *Weyant v. Okst*, 101 F.3d 846, 856 (2d Cir. 1996)), *overruled on other grounds by Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017).  The Eighth Amendment thus imposes on prison officials a duty to ensure inmates receive adequate medical care, *Farmer v.*

*Brennan*, 511 U.S. 825, 832 (1994), yet "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).  In particular, an allegation of medical malpractice based on negligence alone does not state a claim for an Eighth Amendment violation; rather, the inmate plaintiff must allege the defendants who allegedly engaged in the medical malpractice were deliberately indifferent to his serious medical needs.  *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).  Nor does negligence constitute deliberate indifference for purposes of an Eighth Amendment claim.  *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003).  Furthermore, a prison inmate "does not have the right to choose his medical treatment as long as he receives adequate treatment."  *Hill*, 657 F.3d at 123 (citing *Estelle v. Gamble*, 429 U.S. 97, 106-07 (1976)).

"'[A] prison official violates the Eighth Amendment only when two requirements are met,'" one requirement being subjective, and the other objective.  *Salahuddin*, 467 F.3d at 279 (quoting *Farmer*, 511 U.S. at 834).  "The objective component requires that 'the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.'"  *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).  The second, subjective component requires "the official charged with deliberate indifference must act with a 'sufficiently culpable state of mind.'"  *Hill*, 657 F.3d at 122 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  In the instant case, as Defendants argue, Defendants' Memorandum at 7-20, the record establishes Plaintiff cannot meet either the objective or subjective prong of an Eighth Amendment deliberate indifference claim.

In connection with the objective component, "[d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care," although "the prison official's duty is only to provide reasonable care," such that "'prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause,' and, conversely, failing 'to take reasonable measures' in response to a medical condition can lead to liability." *Salahuddin*, 467 F.3d at 279 (citing and quoting *Farmer*, 511 U.S. at 844-47) (bracketed material in original)). The objective test's second inquiry "asks whether the inadequacy in the medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993) (holding prisoners may claim Eighth Amendment violations based both on current harm and "very likely" future harm)). As such, where failure to provide any treatment for an inmate's medical condition is alleged, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)). Where, however, inadequate medical treatment is alleged, "the seriousness inquiry is narrower, . . . 'focus[ing] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Id.* (quoting *Smith*, 316 F.3d at 185).

In the instant case, it is undisputed that in 2007, prior to his current incarceration, Plaintiff was in a motorcycle accident and sustained a back injury resulting in chronic pain syndrome, lumbago (low back pain), arthritis, lumbosacral radiculopathy (sciatica),

a very large central disc herniation at L5-S1 causing marked compression of the thecal sac and S1 nerve roots, Plaintiff's Affidavit ¶ 4 and Exh. 1 (Dkt. 36 at 2), and that Plaintiff underwent surgical excision of two spinal discs.  Plaintiff's Affidavit ¶ 4.  The court assumes, for the sake of this discussion, that Plaintiff's back condition is sufficiently serious for this threshold inquiry, *i.e.*, that the back condition qualifies as "a condition of urgency, one that may produce death, degeneration, or extreme pain . . . ." *Hill*, 657 F.3d at 122.  The court thus turns to whether Plaintiff was denied adequate care for his back condition and, if so, whether such denial was sufficiently serious as to cause, or threaten to cause, Plaintiff harm.  *Salahuddin*, 467 F.3d at 279.  Plaintiff's medical indifference claim pertains to the two-month period from July 13 to September 18, 2012, during which Plaintiff claims he received no medical treatment at all, yet Plaintiff's Ambulatory Health Record ("AHR"),[9] establishes Plaintiff was seen at by nurses and at sick call during the relevant two-month period more than 20 times in connection with his complaints of back pain, and the nursing staff routinely brought Plaintiff's complaints to the attention of Southport's medical providers Physician Assistant Benjamin Oakes ("PA Oakes"), and Wesley K. Canfield, M.D. ("Dr. Canfield").  AHR at Bates 373-75, 377-83, 385-89, and 397.  During the relevant two-month time period, PA Oakes monitored Plaintiff's condition and provided oversight for Plaintiff's care, PA Oakes Declaration ¶ 92, including seeing that Plaintiff, upon complaining of back pain, was first treated most conservatively with pain management and pain

---

[9] Defendants hand-delivered to the court a copy of Plaintiff's AHR, indicating it was "for filing under seal," and on February 24, 2018, moved to file Plaintiff's AHR under seal (Dkt. 31), which motion was granted by the undersigned on February 15, 2018 (Dkt. 32).  No copy of the AHR, however has been electronically filed; rather, the only copy provided to the court is the hard-copy that was hand-delivered, and which AHR has been retained as a court exhibit to facilitate further judicial review.  References to the AHR are to its Bates stamped pages.

medications, and then received more intense treatment consisting of epidural blocks (steroid injections), all of which were continually monitored relative to Plaintiff's back condition symptoms. *Id.* ¶¶ 90-91. Medications prescribed for Plaintiff included nonsteroidal anti-inflammatory drug for pain and inflammation caused by arthritis, including Mobic, Roboxin, and Votaren. *Id.* ¶ 93. Although Plaintiff requested Ultram, which Plaintiff has occasionally received, because Ultram is a narcotic, it is not indicated for long-term pain management but only for short-term use particularly where, as here, the patient has a history of drug diversion and abuse problems. PA Oakes Declaration ¶¶ 88-89, 93. Dr. Canfield approved Plaintiff for pain management therapy, and on August 21, 2012, Plaintiff received an epidural steroid injection or "nerve block" by a pain management specialist at Upstate Medical Center in Syracuse, New York. AHR at Bates 265. Plaintiff was never considered a candidate for further invasive treatment (surgery) for his back condition, PA Oakes Declaration ¶ 91, and Plaintiff does not argue otherwise. Moreover, Plaintiff's AHR is replete with notations that either PA Oakes or Dr. Canfield reviewed Plaintiff's medical chart, including Plaintiff's complaints, indicating that both PA Oakes and Dr. Canfield were aware of Plaintiff's medical complaints and condition. See PA Oakes Reply Declaration ¶¶ 4-6 (referencing specific AHR entries, 44 of which in a six-month time period include the initials of either PA Oakes or Dr. Canfield indicating review of the entries). Accordingly, the record does not support Plaintiff's claim that he received no treatment for his back condition for the relevant two-month period and presents no material issue of fact on this claim.

Insofar as Plaintiff's claim can be construed as challenging the adequacy of the care he did receive, the undisputed evidence in the record fails to establish any issue of

fact that any allegedly inappropriate treatment or interruption in treatment resulted in or threatened to cause Plaintiff any harm.  Specifically, Plaintiff maintains that while housed at Elmira, he was prescribed use of a TENS Unit, cane, back brace, physical therapy, and pain management medications Neurontin and Mobic, but upon being transferred to Southport on July 13, 2012, such therapies were discontinued, causing Plaintiff "to experience excruciating pain and numbness in [his] back and lower extremities, and an overall deterioration of [his] physical condition."  Plaintiff's Affidavit ¶¶ 6-9.  Plaintiff further maintains that his repeated requests to be examined by a medical doctor were ignored, and Plaintiff was given only Mobic which, by itself, did not provide relief of Plaintiff's pain and other symptoms.  *Id.* ¶¶ 8-9.  Plaintiff's assertions are, however, without factual basis.

In particular, in support of his claim, Plaintiff submitted a copy of a Medical Restriction Permit as evidence he was provided with a TENS Unit while housed in Elmira, Plaintiff's Exh. 3 (Dkt. 36 at 6-7), and the Medical Restriction Permit indicates Plaintiff was given permission for a TENS Unit for one year, commencing February 4, 2011, with re-evaluation scheduled for February 4, 2012.  A subsequent Medical Restriction Permit granted Plaintiff permission to use a cane and a TENS Unit from April 10, 2012, with re-evaluation scheduled for February 10, 2013.  Complaint, Exh. F (Dkt. 1-1 at 22).[10]  As Defendants explain, however, medical permits do not transfer from one

---

[10] The authenticity of the subsequent Medical Restriction Permit is questionable because, as Defendants explain, Defendants' Statement of Facts ¶¶ 56-59, although it purportedly was issued by Elmira Correctional Facility, it bears the signature of Defendant vonHagn, who worked at Southport, is dated April 10, 2013, when Plaintiff was housed at Southport, and indicates Plaintiff's cell number is "G-1-30," which is the same cell number indicated on the earlier Medical Restriction Permit, *see* Dkt. 36 at 7, whereas Plaintiff's cell number at Southport as of April 10, 2013, was "C-07-021."  Defendants' Statement of Facts ¶ 59.  Plaintiff neither disputes nor offers any explanation for the discrepancies.  Plaintiff's Statement of Facts ¶¶ 56-69.

correctional facility to another such that even if Plaintiff had a TENS Unit at Elmira, a fact of which Defendants were unaware, upon transferring to Southport, Plaintiff needed to request from Southport medical providers another TENS Unit, but Plaintiff's AHR is devoid of any record indicating Plaintiff even made such request, and Defendants were without authority to issue a TENS Unit.  vonHagn Declaration ¶¶ 10-16; Clement Declaration ¶¶ 9-15; Fuller Declaration ¶¶ 8-14; AHR at Bates 390.  Furthermore, although Plaintiff was not re-issued a TENS Unit, and Plaintiff alleges that as a result of inadequate treatment for his back, he "had to be rushed to outside hospital for emergency treatment, [of] steroid shots in his spine], Complaint ¶ 15, Plaintiff's AHR indicates that Plaintiff's August 21, 2012 appointment for steroid injections at Upstate Medical Center was scheduled on May 11, 2012, prior to Plaintiff's transfer to Southport from Elmira, AHR at Bates 265, 389, belying Plaintiff's assertion that the administration of the steroid injections was on an emergency basis.  Further, the day after receiving the steroid injections, Plaintiff was seen at sick call at Southport, as well as on August 28, 2012, complaining the nerve block did not help alleviate his back pain, *id.* at Bates 377-78, and on October 26, 2012, Dr. Canfield discontinued Mobic and prescribed Robaxin.  *Id.* at Bates 366.

PA Oakes, who oversaw Plaintiff's care while housed at Southport, explains that upon his arrival at Southport, Plaintiff was prescribed for low back pain Mobic which is neither a narcotic nor addictive.[11]  PA Oakes Declaration ¶¶ 19-20.  Oakes also relies on Plaintiff's AHR as refuting Plaintiff's claim that he was on Neurontin when he transferred to Southport.  *Id.* ¶ 28 (citing AHR at Bates 387).  Plaintiff's AHR indicates

---

[11] The court notes Plaintiff's AHR indicates Plaintiff has a history of "medication diversion."  AHR at Bates 389.

that when Plaintiff was initially evaluated upon transferring to Southport on July 13, 2012, his only chronic medical problem was asthma, his medications included Mobic and Albuterol, Plaintiff had a recent history of drug abuse, and was pending evaluation for low back pain.  AHR at Bates 390.  On October 29, 2012, PA Oakes saw Plaintiff who had no numbness or acute distress, and had full range of motion, but complained of sharp back and hip pain, for which PA Oakes prescribed Voltaren, a non-narcotic, anti-inflammatory pharmaceutical for pain, inflammation, and arthritis.  PA Oakes Declaration ¶ 63 (citing AHR at Bates 365).  On November 5, and 14, 2012, Plaintiff complained at sick-call the newly prescribed medications did not help his back pain, PA Oakes put Plaintiff on the list for medical call-out.  *Id.* ¶ 65.

Despite some complaints of ongoing lower back pain and numbness in his legs, PA Oakes Declaration ¶ 27 (citing AHR at Bates 387), Plaintiff never presented to Southport medical personnel with a deterioration in neurological deficit or decreased range in motion.  *See* PA Oakes Declaration ¶¶ 16, 24, 27 (citing AHR at Bates 387). Further, PA Oakes noted that prior to his transfer to Southport, Plaintiff had been scheduled for injections.  Although Plaintiff may not have agreed with the course of treatment Defendants took with regard to Plaintiff's low back pain, the record simply fails to establish any issue of fact suggesting that such treatment was inadequate or caused or threatened Plaintiff with serious harm required to maintain Plaintiff's Eighth Amendment claim.  *Hill*, 657 F.3d at 122.  Accordingly, both relevant inquiries fail to establish the objective component of Plaintiff's medical indifference claim.

With regard to the subjective component, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of

knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280 (citing *Wilson*, 501 U.S. at 302). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law," requiring "that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 836-40). Such "recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent," with "[t]he charged official [ ] subjectively aware that his conduct creates such a risk." *Id.* at 280-81 (citing *Farmer*, 511 U.S. at 835-37). To establish the requisite culpable state of mind for the subjective prong, "the official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hill*, 657 F.3d at 122 (quoting *Farmer*, 511 U.S. at 837). "The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere. Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

In the instant case, because the record absolutely fails to support that Plaintiff was denied adequate medical treatment for his back condition, it logically follows there is no basis on which to find the failure to adequately treat Plaintiff's back condition was done with a sufficiently culpable state of mind to meet the subjective prong of an Eighth Amendment medical indifference claim. Accordingly, Plaintiff cannot avoid summary

judgment on either the objective or subjective prong of his Eighth Amendment claim relative to his back condition.

Although the undersigned recommends dismissal of Plaintiff's Eighth Amendment claim insofar as it is predicated on Defendants alleged indifference to abnormal urinalysis tests results on August 10 and 14, 2012, based on failure to exhaust administrative remedies relative to the claim, *see* Discussion, *supra*, at 12-16, the merits of the claim are addressed in the alternative should the District Judge find the claim was administratively exhausted. In particular, Plaintiff claims that on August 10 and 14, 2012, urinalysis test results indicated the presence of blood in his urine,[12] which Plaintiff attributes to nerve damage relative to his back condition. Complaint ¶¶ 16, 33. Plaintiff further alleges that Defendants falsely reported the urinalysis results were normal and failed to provide any medical treatment for the condition. *Id.* ¶¶ 15-17. The undisputed medical evidence in the record, however, fails to show any issue of fact supporting Plaintiff's claim.

Preliminarily, insofar as Plaintiff claims that Defendant Clement falsely reported to Plaintiff that the results of his August 10 and 12, 2012 urinalysis tests showing the presence of blood in his urine were normal, the undisputed evidence shows that on August 15, 2012, Plaintiff was provided with a "sick call response" form on which it is indicated that Plaintiff's urinalysis result were reviewed by a nurse practitioner or medical doctor, were not "essentially normal," and would be discussed with Plaintiff on call-out. Plaintiff's Exh. 8 (Dkt. 36 at 14-15). Defendant Clements states he provided Plaintiff with the "sick call response" on which the words "essentially normal" were

---

[12] The court assumes, for the sake of discussion, that the presence of blood in Plaintiff's urine is a sufficiently serious medical condition for purposes of an Eighth Amendment failure to treat claim.

crossed out, thereby indicating the results were not normal, and advised Plaintiff the results would be discussed with him by a medical provider at sick-call.  Clements Declaration ¶¶ 31, 42.  Accordingly, there is no merit to Plaintiff's assertion that the urinalysis tests results were falsely reported to him.

Nor can Plaintiff establish either the objective or subjective prong of the Eighth Amendment failure to treat claim relative to his urological condition.  Specifically, PA Oakes asserts that since his transfer to Southport, Plaintiff had routine urine and lab tests for which Plaintiff had no problem providing urine samples and did not report any urinary retention or bladder problems.  PA Oakes Declaration ¶ 64 (citing AHR at Bates 401, 402).  After Plaintiff complained on December 6, 2012, of difficulty urinating, PA Oakes ordered a urinalysis and culture, with normal results except for the presence of blood, for which Plaintiff was placed on the medical call-out list.  *Id.* ¶¶ 67-68, 70 (citing AHR at Bates 357).  On December 12, 2012, Plaintiff provided another urine sample, verbalizing no complaints, *id.* ¶ 71 (citing AHR at Bates 355), and the results were reviewed by PA Oakes on December 13, 2012.  *Id.* ¶ 72.  On December 14, 2012, Plaintiff's complaint at sick call of blood in his urine and abdominal pain was reviewed by PA Oakes and Dr. Canfield, and PA Oakes met with Plaintiff who refused a prostate examination.  *Id.* ¶ 73.  PA Oakes then ordered catherization for which Plaintiff was admitted to the infirmary, and 250 cc of urine were collected and sent for laboratory analysis, the results of which, except for the presence of blood, were normal with no culture growth detected.  *Id.* (citing AHR at Bates 354).  On December 17, 2012, Plaintiff presented to sick call complaining of urination problems since the catherization, and Plaintiff's chart was provided to a medical doctor.  *Id.* ¶ 74 (citing AHR at Bates 353).

On December 18, 2012, Plaintiff was provided with a sick call response advising the medical doctor who reviewed Plaintiff's chart assessed Plaintiff needed a prostate exam. *Id.* ¶ 75 (citing AHR at Bates 352). Plaintiff was advised a urology consult was scheduled by PA Oakes at sick call on December 27, 2012, *id.* ¶ 79 (citing AHR at Bates 351), and by Dr. Canfield on January 9, 2013. *Id.* ¶ 84 (citing AHR at Bates 348-49). On January 26, 2013, Plaintiff was catheterized after reporting he was unable to urinate for 24 hours, but the small amount of urine collected from the catherization was inconsistent with Plaintiff's claimed inability to urinate. *Id.* ¶ 86; AHR at Bates 346. By letter to Southport medical dated February 25, 2013, Plaintiff advised he did not want to go on any future medical trips and requested he be taken off the list for such trips. *Id.* ¶ 87 (citing AHR at Bates 429). Despite "gross hematuria," on February 26, 2013, Plaintiff refused a prostate exam, *id.* (citing AHR at Bates 339), and on February 27, 2013, Plaintiff refused a cystoscopy. *Id.* (citing AHR at Bates 342). Simply put, Plaintiff's medical evidence in the record establishes Plaintiff's complaints relative to blood in his urine were not ignored but, rather, Plaintiff did not comply with Defendants' attempts to arrange for diagnostic testing to determine the cause. Accordingly, Plaintiff cannot meet the objective or subjective prong of an Eighth Amendment deliberate indifference claim relative to the presence of blood in his urine.

Defendants' Motion for summary judgment on Plaintiff's Eighth Amendment claim should be GRANTED.

### D.    Retaliation

Plaintiff claims that because of his repeated complaints regarding his medical condition and filing the July 30, 2012 Grievance, Defendant Capece, on December 5,

2012, approached Plaintiff for an allegedly random urine test, demanding Plaintiff provide a urine sample and advising Plaintiff "if you are going to play that shy-bladder shit, you could save us some time and I could just write the ticket. . . ."  Complaint ¶ 18. Plaintiff maintains the comment demonstrates Capece was aware of Plaintiff's grievances for denial of medical treatment, *id.*, and further failed to follow established urinalysis protocol intended to ensure collection of a proper sample, including inquiring whether Plaintiff is on medication, or suffers from a "shy-bladder," or any other medical complication that might prevent Plaintiff from providing a sample.  *Id.*  According to Plaintiff, when he attempted to explain a medical condition interfered with Plaintiff providing a urine sample, Capece again threatened Plaintiff and then wrote an Inmate Misbehavior Report ("IMR")[13] for which Plaintiff had to undergo a Tier III disciplinary hearing.  *Id.* ¶¶ 19-20.  Defendants argue Plaintiff's retaliation claim fails on the merits because "[u]rine tests are a fact of prison life" and, thus, do not satisfy the "adverse action" prong of a retaliation claim, Defendants' Memorandum at 20, and Plaintiff has no evidence that the urinalysis was administered for any illegitimate purpose, *id.*, or was causally connected to Plaintiff's protected activity.  *Id.* at 20-21.  In opposing summary judgment, Plaintiff clarifies he does not base his claim of retaliation for exercising his First Amendment right to seek redress of grievances on the administration of the urine test but, rather, on the subsequent issuance of the IMR when Plaintiff was unable to provide the urine sample upon Capece's demand.  Plaintiff's Response at 13-14. Plaintiff further maintains that the random drug testing and issuance of the IMR occurred less than 5 months after Plaintiff filed the Grievance, well within the six-month

---

[13] Capece Declaration Exh. A (Dkt. 28-3 at 4-5).

period held within the Second Circuit as sufficient to constitute circumstantial evidence of retaliation. *Id.* at 13-14 (citing *Povoski v. Lacy*, 2017 WL 9511094, * 15 (N.D.N.Y. Dec. 13, 2017)). In further support of summary judgment, Defendants argue Plaintiff fails to refute undisputed facts undermining causation, an essential prong of Plaintiff's retaliation claim, *see* Discussion, *infra*, at 29, including that Capece, in attempting to collect a urine sample from Plaintiff, was merely following his supervisor's orders, and that Capece has no knowledge of Plaintiff's July 30, 2012 Grievance. Defendants' Reply at 8.

Plaintiff's retaliation claim requires Plaintiff prove "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (internal quotation marks and citation omitted). "Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003). The plaintiff bears the initial burden of demonstrating an improper motive played a part in the defendants' action, after which the burden shifts to the defendant to show the same action would have been taken absent any improper motive. *Id.* at 288.

In the instant case, "[i]t is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition the government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'" *Scott*, 344 F.3d at 288 (quoting *Graham v. Henderson*, 89 F.3d 75, 80

(2d Cir. 1996)).  Accordingly, Plaintiff's filing of the Grievance on July 30, 2012, constituted protected activity and Defendants do not argue otherwise.

Whether requiring Plaintiff to submit to a urinalysis test constituted an adverse action, an adverse action is defined in the context of a prison retaliation claim as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights*."  Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation and citation omitted).  Significantly, this court has held that "[i]nsofar as urinalysis 'involves both embarrassment and potential punishment, being required to submit to a urinalysis constitutes an adverse action."  *Holmes v. Fischer*, 2016 WL 552962, at *10 (W.D.N.Y. Feb. 10, 2016), *report and recommendation adopted*, slip op. April 7, 2016 (Dkt. 135) (09-CV-00829S(F)), *appeal dismissed* (Dkt. 140) (2d Cir. Sept. 22, 2016).  *But see Bumpus v. Canfield*, 495 F.Supp.2d 316, 317 (W.D.N.Y. 2007) ("Urine tests are a fact of prison life and I do not find that one urine test would chill a prisoner of ordinary firmness from filing grievances." (internal citations omitted).  Nevertheless, even assuming, *arguendo*, Plaintiff can establish an adverse action for a retaliation claim, the record fails to support the requisite causal connection.

Specifically, in support of their argument that Plaintiff is unable to establish the requisite causal connection, Defendants rely on the Capece Declaration and attachments thereto establishing that when Capece attempted to collect the urine sample from Plaintiff on December 5, 2012, Capece had no input as to which inmates would be chosen for random urinalysis but merely followed his supervisor's orders and was unaware of any complaints or grievances made by Plaintiff.  Capece Declaration ¶¶ 4-5.  According to Capece, at 9:20 A.M. on December 5, 2012, he gave Plaintiff a direct

order to provide a urine specimen for a random urinalysis test, advising Plaintiff had

three hours to provide the sample, but the failure to do so would constitute a violation of

facility rules and incur the same disciplinary disposition as a positive test result would

support. *Id*. ¶¶ 6-7. By 12:22 P.M. on December 5, 2012, Plaintiff had failed to produce

the requested urine specimen and, consequently, Capece issued the IMR for violating

DOCCS rules 180.14 (requiring inmates follow DOCCS guidelines and staff directions

regarding urinalysis testing), and 106.10 (refusing a direct order). Capece also

completed Request for Urinalysis Form 2082 ("Form 2082")[14] indicating Plaintiff was

advised the urinalysis request was "random." Capece further indicates that when he

requested Plaintiff provide a urine specimen on December 5, 2012, Capece was

unaware of any complaint filed by Plaintiff, and denies advising Plaintiff against claiming

to have a "shy bladder." Capece Declaration ¶ 17. In completing Form 2082, Capece

also indicated that Plaintiff did not willfully refuse to submit a urine specimen, that

Plaintiff did not claim to be unable to submit a urine specimen while in the presence of

others, and that Plaintiff was given at least three hours to submit a specimen. Had

Plaintiff stated he was unable to submit a specimen in the presence of others, Capece

would have been required to follow DOCCS Directive # 4937, § IV-E ("§ IV-E")

requiring, *inter alia*, review of the Statewide Special Accommodation list to ascertain

whether Plaintiff was listed as having difficulty producing a urine specimen, and strip

frisking Plaintiff who then must be provided with a gown or other garment to wear prior

to placement in the drug watch cell for up to three hours, during which time water to

drink is provided. Capece's failure to follow the additional steps set forth in § IV-E is

---

[14] Capece Declaration Exh. B (Dkt. 28-3 at 6-7).

consistent with Capece's statement that Plaintiff never advised he had a shy bladder.

Nor is there any indication in the record that Capece was aware that Plaintiff had filed

any complaint or inmate grievances; significantly, Plaintiff admits he previously provided

urine samples, albeit in connection with medical testing rather than random drug testing,

in "early August 2012," Plaintiff's Affidavit ¶ 21, and in "late October 2012." *Id.* ¶ 31.

Plaintiff admits he never complained to Southport's medical providers of being unable to

produce a urine sample until December 6, 2012, the day after the IMR issued.[15]

Plaintiff's Affidavit ¶¶ 38, 41; Plaintiff's Dep. Tr. at 71.  Furthermore, Plaintiff's asserted

clarification, made for the first time in opposing summary judgment, that he relied in

support of his retaliation claim not on the randomly ordered urinalysis test but, rather, on

the subsequent issuance of the IMR, blinks reason insofar as without Plaintiff having

failed to produce a urine sample, the IMR never would have issued.

Accordingly, the evidence in the record fails to establish an issue of fact which, if

decided in Plaintiff's favor, could support the required causal connection between

Plaintiff's filing of the July 30, 2012 Grievance and the ensuing urinalysis test and

issuance of the IMR so as to support Plaintiff's retaliation claim.  Summary judgment

should, therefore, be GRANTED in favor of Defendants on Plaintiff's retaliation claim.

### E.    Due Process

Plaintiff claims he was denied due process in connection with the Tier III

disciplinary hearing held with regard to the IMR issued by Defendant Capece on

December 5, 2012, following Plaintiff's failure to provide a urine sample for the random

---

[15] Even if Defendants should have complied with the additional steps in § IV-E, it is settled that the failure to comply with a DOCCS Directive does not give rise to a civil rights violation.  *Shakur v. Selsky*, 391 F.3d 106, 119 (2d Cir. 2004) (holding state prison directives do not create federally protected rights).

drug testing for which Plaintiff had been selected. Complaint ¶¶ 22-30. According to Plaintiff, following the issuance of the IMR, Plaintiff was denied due process at the Tier III disciplinary hearing ("the hearing"), conducted before Defendant Esgrow on December 19, 2012, in that Plaintiff was denied the opportunity to call witnesses to testify on his behalf, especially a medical doctor who Plaintiff maintains would have testified in support of Plaintiff's claimed inability to urinate on command, and relevant portions of Plaintiff's AHR were not presented such that Esgrow's guilty determination was not supported by reliable evidence. Plaintiff's Response at 16-19. Plaintiff's due process claim fails on the merits.

Preliminarily, insofar as Plaintiff's due process claim can be construed as alleging he was subjected to a false misbehavior report, the filing of a false misbehavior report generally does not give rise to a constitutional violation so long as the inmate against whom the charges are levied is provided with a fair Tier III disciplinary hearing. *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988). As to the prison disciplinary sentence imposed following the guilty disposition on Plaintiff's Tier III hearing, Plaintiff was sentenced to confinement in Southport's Special Housing Unit ("SHU") for six months, along with loss of recreation and visits. *See* Esgrow Declaration Exhs. D and E (Dkt. 28-5 at 28 and 31). Although Defendants argue the disciplinary sentence was not sufficiently atypical nor posed a significant hardship on a protected liberty interest as required for a due process violation, Defendants' Memorandum at 22 (citing *Hernandez v. Sposato*, 2015 WL 4097784, at * 4 (E.D.N.Y. July 8, 2015), and *Saxon v. Goord*, 2007 WL 1695582, at * 4 (W.D.N.Y June 7, 2007)), the Second Circuit recognizes that "[a] period of confinement under typical SHU conditions . . . lasting between 101 and

305 days may trigger a protected liberty interest, depending on the specific conditions of confinement." *Palmer v. Richards*, 364 F.3d 60, 64-65 (2d Cir. 2004). In the instant case, because the parties have not discussed in detail the specific conditions of Plaintiff's SHU confinement, the court assumes, *arguendo*, the conditions of such confinement constituted a hardship "substantially more grave" than those ordinarily experienced by prisoners in the general prison population so as to implicate a protected liberty interest, triggering due process review. *See Kalwasinski v. Morse*, 201 F.3d 103, (2d Cir. 1999) (finding district court failed to conduct proper review of SHU conditions in determining no deprivation of a protected liberty interest occurred, but finding such error was harmless because the inmate plaintiff was afforded all required due process at the disciplinary hearing).

The Second Circuit has explained that the due process protections afforded a prison inmate do not equate to "the full panoply of rights" due to a defendant in a criminal prosecution. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974)). Notably, there is no right to counsel or to confrontation at prison disciplinary hearings. *See Wolff*, 418 U.S. at 567–70. Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *See Wolff*, 418 U.S. at 563–67; *accord Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004); *Kalwasinski,* 201 F.3d at 108. Since *Wolff,* the Supreme Court has clarified that judicial review of the written findings required by due process is limited to

determining whether the disposition is supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). This standard is extremely tolerant and is satisfied if "there is *any* evidence in the record that supports" the disciplinary ruling. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir. 2000) (italics in original). Nevertheless, the "some evidence" standard requires some "reliable evidence." *Luna,* 356 F.3d at 488; *see Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir. 2001). In the instant case, the undisputed evidence in the record establishes Plaintiff was accorded all process due in connection with the disciplinary hearing.

Plaintiff maintains that Hearing Officer Esgrow "has a long history of racial discrimination against black prisoners" resulting in numerous due process violations which have been the subject of grievances "by large mass of the black prisoners population." Complaint ¶ 26. As Defendants argue, Defendants' Memorandum at 23, Plaintiff points to no evidence in support of this claim, *i.e.*, that Plaintiff was deprived of a neutral hearing officer, and Plaintiff does not argue otherwise. Because "[m]ere speculation and conjecture are insufficient to avoid summary judgment," *see Bratton v. Goord*, 256 Fed.Appx. 432, 432 (2d Cir. Dec. 7, 2007) (citing *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)), this claim cannot survive summary judgment.

Nor is there any merit to Plaintiff's argument that he was denied the right to call witnesses at the hearing. Although affording an inmate "a reasonable opportunity to call witnesses" is among the rights required for due process in connection with a prison disciplinary hearing, *Sira*, 380 F.3d at 69, in the instant case, the record establishes that Plaintiff never requested any inmate witnesses be called but did request Defendant

Capece and one Dr. Colgan be called.  *See* Esgrow Declaration Exh. D (Dkt. 28-5 at 18-19) (Assistant Form).  Plaintiff's inmate assistant, Sgt. Sorrell, completed the Assistant Form indicating that on December 10, 2012, he interviewed both Capece and Dr. Colgan and reported the results to Plaintiff.  *Id.*  At the hearing, Plaintiff, in response to Esgrow's inquiry whether Plaintiff had "any requests for witnesses?" responded, "If you need to, you can speak to the doctor."  *Id.* at 23.  Esgrow then briefly adjourned the hearing to arrange for Defendant Nurse Administrator vonHagen to take the stand.  *Id.* at 24.  In response to Esgrow's questions, vonHagn testified that Plaintiff's medical records establishes that on December 6, 2012, the day after the incident giving rise to the IMR that was the subject of the hearing, Plaintiff presented to sick call complaining of difficulty urinating for the previous 1½ weeks, and reported hematuria on December 11, 2013.  *Id.* at 24-25.  Plaintiff's ensuing infirmary admission for catherization on December 14, 2012, was discussed, as was the fact that Plaintiff's AHR, including doctor's notes, were silent as to any indication of Plaintiff's urinary difficulties prior to December 6, 2012.  *Id.* at 25-27.  It was on this evidence that Esgrow found Plaintiff failed to prove an inability to urinate as of December 5, 2012, the relevant date for purposes of the IMR.  *Id.* at 28; Hearing Disposition (Dkt. 28-5 at 33).  The guilty disposition thus is supported by some evidence in the record.  *See Hill*, 472 U.S. at 455.

Even if Plaintiff had stated to Capece that he was having difficulty urinating, such that Capece was required to comply with DOCCS Directive # 4937, § IV-E, pursuant to which Capece would have been required to, *inter alia*, review the Statewide Special Accommodation list to ascertain whether Plaintiff was listed as having difficulty producing a urine specimen, so as to sustain Plaintiff's claim of difficulty urinating,

Plaintiff's claim still fails because, as noted, Plaintiff's AHR at that time would have been devoid of any records supporting Plaintiff's claim. Accordingly, there is no merit to this argument. Furthermore, Plaintiff's claim newly asserted in opposing summary judgment that Esgrow should have adjourned the hearing to allow vonHagn to obtain EMG test results, Plaintiff's Response at 18, is without any merit because, as established by Plaintiff's AHR, the EMG was conducted in April 2015, more than two years after the hearing, AHR at Bates such that the EMG records did not then exist and, as such, vonHagn could not have retrieved them had the hearing been adjourned. vonHagn Reply Declaration ¶ 2.[16]

Defendants' motion should be GRANTED as to the due process claim.

### F.    Personal Involvement/Qualified Immunity

Plaintiff alleges Defendants Southport Superintendent Griffin participated in the alleged denial of Plaintiff's due process rights by appointing Defendant Esgrow to conduct the Tier III hearing despite knowledge of Esgrow's history of racial discrimination, Complaint ¶ 26, and Defendants Griffin and SHU Director Prack denied Plaintiff due process by affirming Defendant Esgrow's findings.[17]  Complaint ¶¶ 27-29. Defendants maintain both Defendants Griffin and Prack were not sufficiently personally involved in the asserted due process violation so as to be liable and that insofar as the law may be unsettled in that regard, they are entitled to qualified immunity on the claim.

---

[16] The results of Plaintiff's EMG test are not in the record, but according to a Sick Call Response dated April 28, 2015, Plaintiff was scheduled with a medical provider "to discuss EMG results." AHR at Bates 186.

[17] Plaintiff's due process claim asserted against Defendants Griffin and Prack depend on Plaintiff's due process claim asserted against Defendant Esgrow surviving summary judgment. Because the undersigned is recommending summary judgment be granted on Plaintiff's due process claim against Esgrow, the due process claim is addressed as against Defendants Griffin and Prack only in the alternative should the District Judge disagree that summary judgment should be granted as to Plaintiff's due process claim asserted against Defendant Esgrow.

Defendants' Memorandum at 28-29.  In opposition, Plaintiff argues Defendants Griffin and Prack, by affirming Defendant Esgrow's guilty determination, sufficiently participated in the claimed due process violation, and that qualified immunity does not protect against liability for a Tier III hearing determination that is not based on reliable evidence.  Plaintiff's Response at 21.  In further support of summary judgment, Defendants maintain Plaintiff's opposition does not address caselaw establishing the denial of prison disciplinary appeals does not constitute personal involvement and any dispute on the matter establishes Defendants Griffin and Prack are entitled to summary judgment.  Defendants' Reply at 10.

It is settled that for § 1983 liability to attach, the defendant must have been personally involved in the constitutional violation, and supervisory officials cannot be liable based on mere linkage in the prison chain of command.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  Significantly, "the mere fact that a supervisory official affirmed the result of a disciplinary hearing will not suffice to establish that official's personal involvement in an alleged constitutional violation . . . ."  *Collins v. Ferguson*, 804 F.Supp.2d 134, 140 (W.D.N.Y. 2011).

In the instant case, nothing in the record even remotely suggests that either Defendant Griffin or Prack was involved in Plaintiff's disciplinary hearing beyond simply being in a supervisory position within the prison chain of command, *i.e.*, specifically, appeal of inmate grievances, which is insufficient to subject either Griffin or Prack to liability for any due process violation occurring with regard to the disciplinary hearing violation.  *Richardson*, 347 F.3d at 435; *Collins*, 804 F.2d at 140.  Nor does Plaintiff reference any evidence which could plausibly be construed as establishing Esgrow, as

Plaintiff alleges, Complaint ¶ 26, has exhibited race-based bias in disciplinary hearings such that Griffin's appointment of Esgrow as a hearing officer denied Plaintiff due process and such claim, based on "mere speculation and conjecture," fails. *See Bratton*, 256 Fed.Appx. at 432.

Alternatively, should the District Judge find both that Plaintiff was denied due process with regard to the disciplinary hearing, and that Defendant Griffin and/or Prack's participation was sufficient to establish personal involvement in the due process deprivation, then *a fortiori*, qualified immunity would not protect against liability on such claim. *Zavaro v. Coughlin*, 970 F.2d 1148, 1153 (2d Cir. 1992) ("'The doctrine of qualified immunity serves to shield public officials . . . from liability in § 1983 actions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Purnell v. Lord*, 952 F.2d 679, 683-84 (2d Cir. 1992))). Here, an "inmate's right not to be adjudicated guilty by a neutral hearing officer without some evidence to support that finding was clearly established by [2012] when the [initial] hearing occurred." *Zavaro*, 970 F.2d at 1153 (holding qualified immunity did not shield defendant from liability in connection with inmate's disciplinary hearing "where there was no reliable evidence whatsoever of the inmate's guilt").

Defendants Griffin and Prack are therefore entitled to summary judgment based on lack of personal involvement in the allegedly due process deficient disciplinary hearing for which summary judgment should be GRANTED. Alternatively, Defendants Griffin and Prack would not qualifiedly immune from liability for the alleged due process violations and, on that basis, summary judgment should be DENIED.

## **CONCLUSION**

Based on the foregoing, Defendants' Motion (Dkt. 35) should be GRANTED; the

Clerk of Court should be directed to close the file; alternatively, summary judgment

should be GRANTED in part and DENIED in part.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        March 11, 2019
             Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

<u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u>

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        March 1, 2019
                    Buffalo, New York